IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JEFFREY PAUL CHITWOOD,** | Case No. 1:13-cv-00502 AWI MJS (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |
| **v.** | |
| **GIPSON, Warden,** | |
| Respondent. | |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Doris A. Calandra of the office of the California Attorney General. The parties have not consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 8, 10.)

I.      **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on June 24, 2010, of first degree murder with the personal use of a firearm resulting in death. (Clerk's Tr. at 1115-16.) On July 19, 2010, the trial court sentenced Petitioner to serve an indeterminate term of life without the possibility of parole and twenty-five years to life. (Id.)

1   Petitioner's direct appeal, filed with the California Court of Appeal, Fifth Appellate

2   District, was denied on February 23, 2012. (Lodged Docs. 1-4.) Petitioner filed a petition

3   for review with the California Supreme Court. (Lodged Doc. 5.) The Supreme Court

4   summarily denied the petition on May 9, 2012. (Lodged Doc. 6.)

5   Petitioner proceeded to file post-conviction collateral appeals in the form of

6   petitions for writ of habeas corpus in the Kern County Superior Court, the California

7   Court of Appeal, Fifth Appellate District and the California Supreme Court. The petitions

8   were denied on September 21, 2012, November 7, 2012, and November 13, 2013,

9   respectively. (Lodged Docs. 7-10, 15-16.)

10   Petitioner filed the instant federal habeas petition on April 5, 2013. (Pet., ECF No.

11   1.) Petitioner proceeded to file an amended petition on September 18, 2013. (Am. Pet.,

12   ECF No. 17.) In his amended petition, Petitioner presents five claims for relief: (1) that

13   his Fourth Amendment rights were violated during the search of Petitioner during his

14   arrest; (2) that his Fourth amendment rights were violated as he was subject to an

15   unlawful arrest and illegal car stop; (3) that trial counsel was ineffective for failing to hire

16   a DNA expert to test or retest physical evidence in light of possible cross-contamination;

17   (4) that trial counsel was ineffective for failing to hire a DNA expert to test DNA for third-

18   party culpability; and (5) that the court erred in admitting the testimony of the

19   prosecution's DNA expert.

20   Respondent filed an answer to the petition on March 21, 2014, and Petitioner filed

21   a traverse on April 25, 2014. (Answer & Traverse, ECF Nos. 27-28.)

22   **II.   STATEMENT OF THE FACTS[1]**

23   **FACTS**

24   Chantha Meas worked as a clerk at the Shell gas station and food
mart located at 1508 Airport Drive near Norris Road in Bakersfield. The

25   store was just a quarter mile from the Kern County Sheriff's Department,
and it was the only convenience store in the immediate area. Many of the

26

27   [1]The Fifth District Court of Appeal's summary of the facts in its February 23, 2012 opinion is presumed
correct. 28 U.S.C. § 2254(e)(1).

28

deputies who investigated her homicide had regularly patronized the gas station and store because it was so closely located to their office, and they were familiar with Meas as one of the clerks who worked there.

Meas and her husband, Odom Chap, lived in a rental house which was immediately adjacent to the Shell store. The house was owned by the same person who owned the gas station. Chap worked at another convenience store located in a different part of town.

The Shell store was not open 24 hours a day. Meas had the morning shift and she was responsible for opening the store in the morning. She usually arrived around 3:00 a.m. to prepare the store to open at 4:00 a.m. on weekdays. Meas's usual custom was to call the store's owner once she had opened the store.

The Shell station and store were equipped with video surveillance cameras and recording equipment. The cameras covered the gas pumps, the store's exterior, the alley which was between the store and Meas's adjacent house, and part of the house itself.

**Defendant's activities before the homicide**

Defendant lived on Airport Drive directly north of the Shell store.

The records from Log Cabin Florist showed that defendant ordered flowers from his home address for delivery to the Shell store on August 26, 2008. He placed another order on a different date. The flowers were delivered to Meas at the store.

Jennifer Isbell lived near Meas's house on Airport Drive and described an incident which had occurred one evening a couple of weeks before Meas was killed. On that particular evening, Isbell was sitting on the front porch of her own house and saw a man walk up and down the street. The man was not wearing a shirt. Isbell thought the man was "creepy" and looked like a drug addict. At trial, Isbell identified defendant as the man.

Isbell and her sister got into a car and followed defendant as he continued to walk up and down the street. Defendant stared at Meas's house and opened Meas's mailbox. Defendant walked through the adjacent alley. Isbell drove around the Shell station and met defendant as he emerged from the alley. Isbell flashed the car's bright lights to illuminate defendant, and he hid behind a pole.

The Shell station's surveillance videotapes showed that on October 12, 2008, the day before Meas was killed, defendant visited the Shell store at 4:37 a.m., and he repeatedly returned.**[FN3]**

> **FN3**. Kern County Sheriff's Detective Lackey testified that after the homicide, he met with the owner of the Shell station, who played the surveillance videotapes for him and explained the time-stamps were two hours later than they should have been. Lackey extensively reviewed the entirety of the videotapes for any suspicious activity.

On October 12, 2008, defendant purchased an expensive police

scanner from an electronics store.

**Last contact with Meas**

Around 9:00 p.m. on October 12, 2008, Chap (Meas's husband) left their residence to head to his night shift at the store where he worked. Meas was still asleep when he left. She was scheduled to open the Shell store early the next morning.

At 2:30 a.m. on Monday, October 13, 2008, Chap called the house to wake up Meas so she would be ready for her morning shift at the Shell store. Meas answered the telephone and said she was getting dressed.

**Neighborhood witness**

Bridget Bachman lived directly north of Meas's house. Around 3:30 a.m. on October 13, 2008, Bachman heard a woman screaming, "'Get the f*** out of my yard.'" Bachman did not recognize the woman's voice, but the sound seemed to come from the direction of Meas's house. Bachman went outside but did not hear anything. After about five minutes, Bachman went into her house but then heard somebody hitting something that sounded like metal. Bachman again went outside, but she could not distinguish the sound because of the noise from passing vehicles.

**Meas is taken from her house**

The Shell station's security videotapes revealed the following activities on October 13, 2008. Shortly before 3:00 a.m., a man walked near Meas's garage and through the alley that was adjacent to the store and Meas's house. At 3:12 a.m., the videotape showed Meas struggling with a man. The man took Meas away from the house on foot, while she continued to struggle and resist. They went out of the video frame, and the other security cameras did not pick up their further movements.

**Meas's disappearance**

In the early morning hours of October 13, 2008, the Shell store's owner never received the expected call from Meas to report that she had opened the store. At 5:00 a.m., Melissa Chao, the owner's wife, went to the store to check on the situation, and discovered that Meas was not there, and the store was still closed. Chao went to Meas's house, but she was not there. Chao called Chap and told him that Meas was not at work.

Around 6:00 a.m., Chap contacted the sheriff's department and reported that his wife was missing.

**Discovery of Meas's body**

Around 6:15 a.m. on October 13, 2008, Larry Clouser, a general contractor, was driving to his workplace in the rural oil fields located north of the Shell store. Clouser drove north on Airport Drive, which turned into Granite Road, and he continued through the intersection of Round Mountain Road. He pulled onto an access road and found a woman's body lying in the dirt. Her head was surrounded by a dark liquid which appeared to be blood.

The deputies and detectives who responded to the desolate area recognized the victim as Meas, the missing clerk, based on their prior transactions at the Shell store. Meas was wearing her Shell uniform shirt. The zipper on Meas's blue jeans was partially down.

**Defendant's activities**

At 5:00 a.m. on October 13, 2008, Lloyd Hatfield reported for work as a crane operator at a construction company's main yard on Airport Drive off Highway 33. Hatfield met defendant there for the first time that morning. It was defendant's first day of work, and defendant was assigned to Hatfield's crew.

On October 14, 2008, defendant failed to show up for his job, and he was never seen again at the construction yard.

**Forensic evidence**

There was one live nine-millimeter round and one spent shell casing found in the dirt near Meas's body. Both items had been loaded into and extracted from the same firearm. The impression from the firing pin was consistent with the impression left by a nine-millimeter Glock.

There were fresh tire prints in the only "turnaround" area of the dirt access road. There were also drag marks in the dirt that led to the Meas's body, which indicated the victim had been dragged to the location where her body was found. The drag marks were inconsistent with a struggle. A nylon rope or cord was found in close proximity to the tire prints.

**The pathology evidence**

The pathologist determined Meas had been shot twice in the head. The first gunshot caused an entrance contact wound to the left cheek, which indicated the weapon's barrel had been placed against the skin. The bullet went through her mouth, broke multiple facial bones, and exited through the right side of her check, just in front of the right ear. This gunshot wound was potentially fatal based on the massive blood loss. However, the pathologist determined that Meas survived after being shot the first time, based on the blood aspiration pattern in her lungs.

The pathologist testified Meas suffered a second gunshot wound, which was fatal and the cause of death. This gunshot entered just above the right eyebrow. There was stippling on Meas's forehead and cheek, which indicated the second shot was fired two to four feet away from her body. The bullet traveled from front to back, right to left, and upward. It went through Meas's brain and lodged in the left upper portion of her skull. There was no evidence the gunshot wounds were self-inflicted or that Meas had fired a weapon.

There was a small abrasion on Meas's chin and a facial contusion. There were multiple broad contusions, bruising, and trauma on Meas's wrists and fingers, consistent with some kind of ligature or binding being wrapped around her wrists while she was still alive. The marks were not consistent with the nylon cord found near her body.

**The investigation**

5

Kern County Sheriff's Detectives Lackey and Olmos were on call on the morning that Meas was reported missing, and they responded to the desolate area where the body was found.**[FN4]** They next went to Meas's house and interviewed her husband. Lackey noticed flower vases that were next to the back door. When Lackey saw them, he remembered a conversation he overheard during one of his visits to the Shell store, when Meas and another employee talked about Meas receiving flowers at the store, and the coworker said that Meas had a secret admirer. Based on that memory, Lackey asked Meas's husband if she received those flower while she was at work.

> **FN4**. Detectives Lackey and Olmos were among the officers who regularly patronized the Shell store and recognized Meas's body. At trial, Lackey testified that he was a diabetic, he frequently purchased snacks to get him through the day, and Meas was usually the clerk who was on duty. He did not know where Meas lived. Lackey and Olmos testified they were just one hour away from going off duty when they received the dispatch about the missing clerk and a body being found on the dirt road. Lackey continued to patronize the Shell store after Meas's death. As we will discuss in section III, post, defendant's motion to traverse claimed Lackey and Olmos should have disclosed their prior "relationship" with Meas in the affidavit filed in support of the search warrant, and their failure to do so resulted in a material omission of fact. The court rejected this argument and declined to consider this issue when it reviewed defendant's motion to traverse.

Chap knew that his wife had received a big flower arrangement, which she had placed on their dining room table. Meas told her husband that a friend sent the flowers to her, but she did not reveal that person's identity to him.

Melissa Chao, the Shell store owner's wife, frequently worked at the store with Meas. At trial, Chao testified that Meas said someone was bothering her at work, and Meas asked Chao if she knew who that person was. Chao said no. Chao testified that Meas then told her "the name Jeff," but Chao knew a lot of people named "Jeff." Meas told Chao that "Jeff" sent her flowers.

Detective Lackey testified that when he met with Melissa Chao, he asked if she knew that Meas received flowers from someone named "Jeff." Chao said she didn't know Jeff. Chao told him that on October 12, 2008, the day before the homicide, Meas said that she was concerned about two people who came into the store.

The phone records for both defendant and Meas did not reveal any calls between them.

**Search of defendant's house**

On October 15, 2008, defendant's house was searched pursuant to a warrant.**[FN5]** Detective Fennell supervised the search, and he was assisted by several other officers, including Detectives Lackey and Olmos.

6

**FN5**. As we will discuss in sections II and III, post, Detective Olmos prepared the affidavit in support of the search warrant, and he partially relied on information supplied to him by Detective Lackey.

The master bedroom's closet contained the police scanner that defendant had purchased the day before the homicide. There was an empty blue gun box in the closet that belonged to a nine-millimeter Glock Model 17. The Glock was not found, but there were several weapons in the house, including a Colt semi-automatic assault rifle, a .270-caliber bolt rifle, a .22-caliber revolver, a .12-gauge shotgun, and ammunition for .45-caliber and nine-millimeter weapons.

**Additional forensic evidence**

The detectives seized several items of clothing from the master bedroom's laundry hamper. The right sleeve of a man's shirt tested positive for human blood. The blood contained a mixture of DNA from defendant and Meas.

Defendant's underpants, which were removed from him on October 15, 2008, contained semen and other biological material, including a small amount of Meas's DNA on the outside front portion. There was biological material on the victim's panties, but defendant was excluded as the source.

**Meas's earrings**

During the autopsy, the pathologist found an earring in Meas's pierced left ear. The pathologist did not find an earring on Meas's right ear, but only a pierced-ear backing which was still attached to the back of Meas's right ear lobe. The backing was not sticky or gooey, and it was not embedded in her hair.

During the search of defendant's house, Detective Olmos found an off-white colored pearl-type earring on the carpeted floor of the master bedroom, in front of a dresser. The earring blended into the beige carpet. There was no backing on the studded earring.

Detective Lackey testified that the back part of the earring which the pathologist found on Meas's right ear, matched the earring Detective Olmos found on the floor of defendant's bedroom. A criminalist determined Meas's DNA was on the earring found in defendant's bedroom.

**The computer searches**

A search of the computer found in defendant's house revealed that searches had been conducted on it prior to October 13, 2008, for the names "Chantha," "Meas," and "Mease." There were also searches for various cultural aspects of Cambodia, a short list of English/Cambodian translations, and questions about sending flowers to Asian or Cambodian women while they worked.

In addition, there were specific search inquires made on the computer in 2008 which had been deleted and recovered by investigators.

These recovered inquiries included: "'How to date Cambodian women,'" "'Do Cambodian women like to get flowers?'" "'Is it good when a Cambodian woman tells you that she loves you?'" "'Do Asian women get jealous of white men?'" and "'Why do Asian women love blue-eyed men?'"

**Defendant's statements to Glenn Osbourne**

Glenn Osbourne testified for the prosecution under a grant of immunity for any pending state or federal firearm offenses. Osbourne and defendant had been good friends for 35 years. Osbourne sold a nine-millimeter Glock 17 to defendant in 2000.

Osbourne testified that he was with defendant on the evening of October 13, 2008. Defendant said his mother called to let him know that he was wanted for two homicides and a robbery. Osbourne let defendant sleep at his house that night.

On the morning of October 14, 2008, Osbourne and defendant drove to defendant's house on Airport Drive, and they saw detectives there. As they passed his house, defendant told Osbourne, "'I did it. I did it. I did it.'"

Later on October 14, 2008, Osbourne asked defendant what was going on. Defendant said he had killed "'that girl.'" Osbourne asked if she was "'[t]he waitress,'" and defendant said yes.**[FN6]** Osbourne asked defendant if he shot her in the head, and defendant said yes, and that he used the Glock. Defendant said the body was somewhere off Round Mountain Road. Osbourne asked defendant if he had any remorse, and defendant said yes. Later that night, defendant called Osbourne and said he got rid of the Glock, and he was going to turn himself in.

**FN6**. Osbourne testified that on prior occasions, defendant talked about an "oriental" woman, and he assumed defendant meant a waitress because defendant always ate at restaurants.

Detective Royce Haslip testified that when investigators interviewed Osbourne, he revealed details about the homicide which had not been made public yet, including the fact that a nine-millimeter weapon was used, and it had not been found.

## DEFENSE EVIDENCE

An evidence technician testified that Meas's fingerprints were not found on the interior or exterior of defendant's truck, and defendant's fingerprints were not found in or around Meas's house.

Michael Nelson testified he was with defendant at the construction job, and they drove out to work around 5:00 a.m. The drive took about an hour. Nelson did not know defendant, and they just engaged in chit-chat during the drive. Nelson thought he saw defendant on October 13, 2008, but admitted he was not sure about the date. However, he never saw defendant again at the construction site.

Karrissa Morris, Osbourne's niece, testified she was very close to him and loved him. However, he was not an honest person and liked to

1

fabricate stories that put the spotlight on him.

2

People v. Chitwood, 2012 Cal. App. Unpub. LEXIS 1326, 3-17 (Cal. App. 5th Dist. Feb. 23, 2012).

3 **III.    GOVERNING LAW**

4     **A.    Jurisdiction**

5        Relief by way of a petition for writ of habeas corpus extends to a person in

6  custody pursuant to the judgment of a state court if the custody is in violation of the

7  Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

8  2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

9  suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

10 conviction challenged arises out of the Kern County Superior Court, which is located

11 within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court

12 has jurisdiction over the action.

13    **B.    Legal Standard of Review**

14       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

15 Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

16 filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

17 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

18 the AEDPA; thus, it is governed by its provisions.

19       Under AEDPA, an application for a writ of habeas corpus by a person in custody

20 under a judgment of a state court may be granted only for violations of the Constitution

21 or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n.

22 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

23 state court proceedings if the state court's adjudication of the claim:

24
25
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

26
27
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 28 U.S.C. § 2254(d).

1          1.       Contrary to or an Unreasonable Application of Federal Law

2          A state court decision is "contrary to" federal law if it "applies a rule that

3    contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

4    that are materially indistinguishable from" a Supreme Court case, yet reaches a different

5    result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.

6    "AEDPA does not require state and federal courts to wait for some nearly identical

7    factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

8    even a general standard may be applied in an unreasonable manner" Panetti v.

9    Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

10   "clearly established Federal law" requirement "does not demand more than a 'principle'

11   or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

12   decision to be an unreasonable application of clearly established federal law under §

13   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

14   (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-

15   71 (2003).  A state court decision will involve an "unreasonable application of" federal

16   law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at

17   409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

18   Court further stresses that "an *unreasonable* application of federal law is different from

19   an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529

20   U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks

21   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

22   correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541

23   U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

24   have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S.

25   Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

26   Federal law for a state court to decline to apply a specific legal rule that has not been

27   squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

28   (2009), quoted by Richter, 131 S. Ct. at 786.

1

2.     <u>Review of State Decisions</u>

2

"Where there has been one reasoned state judgment rejecting a federal claim,

3

later unexplained orders upholding that judgment or rejecting the claim rest on the same

4

grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the

5

"look through" presumption.  <u>Id.</u> at 804; <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1198

6

(9th Cir. 2006).   Determining whether a state court's decision resulted from an

7

unreasonable legal or factual conclusion, "does not require that there be an opinion from

8

the state court explaining the state court's reasoning." <u>Richter</u>, 131 S. Ct. at 784-85.

9

"Where a state court's decision is unaccompanied by an explanation, the habeas

10

petitioner's burden still must be met by showing there was no reasonable basis for the

11

state court to deny relief." <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does

12

not require a state court to give reasons before its decision can be deemed to have been

13

'adjudicated on the merits.'").

14

    <u>Richter</u> instructs that whether the state court decision is reasoned and explained,

15

or merely a summary denial, the approach to evaluating unreasonableness under §

16

2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

17

or theories supported or, as here, could have supported, the state court's decision; then

18

it must ask whether it is possible fairminded jurists could disagree that those arguments

19

or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at 786.

20

Thus, "even a strong case for relief does not mean the state court's contrary conclusion

21

was unreasonable." <u>Id.</u> (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75).   AEDPA "preserves

22

authority to issue the writ in cases where there is no possibility fairminded jurists could

23

disagree that the state court's decision conflicts with this Court's precedents." <u>Id.</u> To put

24

it yet another way:

25

26

27

      As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

28

<u>Id.</u> at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

1   are the principal forum for asserting constitutional challenges to state convictions." Id. at

2   787. It follows from this consideration that § 2254(d) "complements the exhaustion

3   requirement and the doctrine of procedural bar to ensure that state proceedings are the

4   central process, not just a preliminary step for later federal habeas proceedings." Id.

5   (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

6                    3.    Prejudicial Impact of Constitutional Error

7        The prejudicial impact of any constitutional error is assessed by asking whether

8   the error had "a substantial and injurious effect or influence in determining the jury's

9   verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

10  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

11  state court recognized the error and reviewed it for harmlessness).  Some constitutional

12  errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v.

13  Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

14  (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

15  assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

16  Strickland prejudice standard is applied and courts do not engage in a separate analysis

17  applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin

18  v. Lamarque, 555 F.3d at 834.

19  **IV.   REVIEW OF PETITION**

20         **A.    Claim One and Two – Illegal Search and Arrest**

21       In claims one and two, Petitioner asserts that the state court erred in denying his

22  motion to suppress the evidence relating to the search of his residence. Specifically,

23  Petitioner claims that the warrant was based on statements made during his illegal

24  detention and that the warrant affidavit contained material misstatements and omissions.

25  The appellate court denied the claims in a reasoned decision, stating:

26       **II. Denial of motion to suppress**

27           As explained ante, defendant's house was searched pursuant to a
28       warrant.  The search warrant was based on an affidavit signed by

Detective Olmos.

Prior to trial, defendant filed a motion to suppress pursuant to section 1538.5. Defendant argued that the search warrant affidavit was based on statements obtained from defendant as a result of an illegal detention, after which he was extensively questioned by the detectives. The superior court conducted a hearing on defendant's motion to suppress and held that, while defendant was subject to an illegal detention, there was sufficient attenuation from that illegality and his subsequent statements such that his statements were properly considered as part of the search warrant affidavit.

Defendant also filed a pretrial motion to traverse and quash the search warrant affidavit, based on the separate argument that there were material misstatements and omissions which undermined the veracity of the affidavit.

On appeal, defendant challenges the court's rulings on both motions. We will review the procedural history of both motions, and then address the validity of the court's denial of defendant's motion to suppress and its findings of attenuation. In section III, post, we will address the court's rulings on defendant's motion to traverse and quash the search warrant.

## A. Procedural history

On October 13, 2008, Meas's body was found. As we will discuss, post, on October 15, 2008, deputies saw defendant driving his truck and performed a traffic stop, during which their guns were drawn and defendant was placed in handcuffs. After defendant's handcuffs were removed, a deputy advised defendant that detectives wanted to speak to him, and defendant agreed to answer questions. Defendant answered questions that day, denied any involvement in Meas's homicide, and admitted he knew Meas from the store and that he sent her flowers. Defendant was not arrested that day.

Later on October 15, 2008, Detective Olmos prepared an affidavit in support of a search warrant for defendant's house. The affidavit summarized the investigative history of the case and defendant's prior interactions with Meas. The affidavit also cited to the statements defendant made to the detectives during the interview. Defendant's house was searched pursuant to the warrant, and the detectives found the blood-stained shirt and the pearl earring.

On October 16, 2008, defendant was arrested for the murder of Meas.

Prior to trial, defendant filed a motion to suppress evidence seized during the search of his house. Defendant argued the traffic stop and

detention performed on October 15, 2008, was illegal, his subsequent statements to the detectives should be suppressed as the fruits of that illegal detention, and the search warrant affidavit was invalid because it was partially based on those statements.

Defendant also filed a motion to traverse and quash the search warrant, based on separate grounds from the illegal detention issue. Defendant argued the search warrant affidavit was based on material misstatements and omitted relevant facts, those misstatements and omissions negated the existence of probable cause to search defendant's house, and all the evidence seized from defendant's house, including the blood-stained shirt and the pearl earring, should be suppressed.

In this section, we will focus on defendant's motion to suppress, and his arguments as to whether his statements to the detectives on October 15, 2008, were the fruits of the unlawful traffic stop and detention, whether those statements must be removed from considering whether the affidavit constituted probable cause for issuance of the warrant, and whether the court should have excluded the blood-stained shirt and pearl earring as additional fruits of the initial unlawful traffic stop.

**B. The traffic stop**

In light of defendant's motion to suppress, the court conducted a pretrial evidentiary hearing as to the validity of the traffic stop performed on defendant on October 15, 2008. Deputy Bobby Voth was the only prosecution witness at the suppression hearing who testified about the circumstances of the traffic stop of defendant's truck.

Voth testified that around 4:30 a.m. on October 15, 2008, he was on patrol and advised to look for defendant and his truck because defendant was wanted for questioning about a homicide which involved a firearm, and the firearm had not been located. Voth recognized the truck at a gas station on Norris Road. Voth contacted his sergeant and advised him about the truck. Voth's sergeant instructed him to stop and detain defendant.

Voth testified that he advised other deputies in the vicinity to wait for the truck to leave the gas station and then initiate an investigative traffic stop. He arranged for two patrol cars to follow the truck and perform the stop. Voth saw defendant in the truck as it left the gas station. Deputies Skidmore and Klarcyk performed the actual traffic stop; Voth was not present when it occurred.

When Deputy Voth arrived at the scene of the traffic stop, there were two patrol cars there with flashing emergency lights. Deputy Skidmore was taking a cover-type position and his gun was drawn. Defendant was in handcuffs, and Deputy Klarcyk placed defendant in the back of a patrol car. Voth never drew his weapon during the detention.

Deputy Voth spoke to the other officers and then removed defendant from the patrol car, conducted a patdown search, and did not find any weapons. Voth removed the handcuffs from defendant. Voth testified a couple of minutes passed between his initial contact with defendant and the removal of the handcuffs. After he removed the handcuffs, they remained outside the patrol car, and Voth explained to defendant that he was being detained because detectives wanted to talk to him about a homicide, and he was not being arrested. Defendant said he understood. Defendant also said his mother told him that Detective Lackey wanted to talk to him.

Deputy Voth testified he again contacted his sergeant, advised him that defendant was detained, and asked what they should do. The sergeant said the detectives were on their way to the scene of the traffic stop.

Voth testified about the ensuing conversation he had with defendant. Voth's firearm was not drawn. The only other deputies present were the two men who performed the traffic stop, and they had returned their weapons to their holsters. None of the deputies drew their weapons again; they were standing outside the patrol cars, defendant was not in handcuffs, and he was never again placed in restraints. Voth advised defendant that the detectives were on their way and asked defendant whether he would like to speak with them. Defendant said yes. Voth testified that he "explained [to defendant] that it might be easier or I asked him if he wanted to go to our headquarters ... where we had an office. I explained to him that detectives could speak to him here or there, but it would be probably more comfortable if we went to the office. I asked him if he would like to go there, and he said that he would." Voth testified that he told defendant "this was voluntary and that he did not have to go if he didn't want to," and defendant agreed to go with them. Voth said that Deputy Skidmore would provide him a ride to the department, which was less than a mile away from the scene, and defendant agreed.

Voth testified that defendant entered Deputy Skidmore's patrol car for the drive to the sheriff's department, and Voth followed in his own patrol car. Defendant was not in handcuffs immediately before or after the drive.

## C. Defendant's statements

Defendant was subsequently questioned at the sheriff's department by Detectives Olmos and Lackey. Defendant's statements were not introduced into evidence at trial, but they were included in Detective Olmos's affidavit in support of the search warrant for defendant's house. As we will discuss in section III, post, the references to defendant's statements are just one part of the six-page search warrant affidavit.

The search warrant affidavit includes a brief description of the traffic stop on defendant's truck, and simply states that deputies conducted an investigative stop on the truck because they believed defendant was the driver. The affidavit failed to mention that defendant was removed from the truck at gunpoint, placed in handcuffs, and put into a patrol car. The affidavit further states that defendant "freely and voluntarily" agreed to go to the sheriff's department for an interview.

The affidavit states that Detectives Olmos and Lackey interviewed defendant and asked about his whereabouts for the prior 48 hours. Defendant said he was at his mother's house, that he knew the detectives were trying to contact him about a double homicide and a robbery, and he "'freaked out'" and avoided contact with the deputies.**[FN7]** Defendant said he was not involved in a double homicide and robbery, and he had heard that Meas had been killed. They told defendant that the video surveillance cameras showed a male walking in front of Meas's garage; defendant replied, "'Oh was she abducted[?]'" Olmos pointed out that he never said Meas was abducted. Defendant "nervously responded" that he assumed she was taken from her house. Olmos again pointed out that he never said Meas was abducted or taken from her residence, and defendant "appeared nervous." Defendant said he failed to go to work because he intended to voluntarily go to the sheriff's department to answer questions.

> **FN7**. The record does not explain why defendant thought he was a suspect in a "'double homicide and robbery.'"

Olmos asked defendant about his relationship with Meas. Defendant said he liked Meas as a friend and bought gifts to "'cheer' her up when she appeared sad." Meas said she was single, and she was "very flirtatious towards him." Defendant said he never asked her for a date and he did not know she was married. Meas told defendant where she lived. Defendant denied killing Meas and denied calling her cell phone.

According to the affidavit, defendant had on a dark colored, hooded sweater during the interview, similar to the one worn by the subject depicted on the videotapes.

Defendant was not arrested at that time and he left the sheriff's department. However, defendant was arrested the next day, on October 16, 2008.

## D. The parties' arguments

After the evidentiary hearing on the legality of the traffic stop, the court stated that the prosecution failed to present any direct evidence as to why Deputy Voth believed defendant was wanted for questioning in the homicide investigation, and there was no evidence to support the initial stop. The court granted defendant's motion to suppress only as to any

information obtained from the initial stop up to the point where Voth removed defendant's handcuffs.

The court asked the parties whether there was sufficient attenuation between the initial illegal detention, to the point where Deputy Voth removed defendant from the patrol car and removed the handcuffs. Defendant argued that everything that flowed from the illegal detention was the fruit of the poisonous tree and subject to suppression, including defendant's subsequent statements to the detectives. Defendant argued it was not reasonable to believe his consent was voluntary when it occurred after he had been removed from his vehicle at gunpoint, handcuffed, and placed in a patrol car. The prosecutor replied that such facts did not necessarily abrogate the voluntariness of defendant's consent to answer questions. Once it was determined that defendant was not armed, the deputies returned their weapons to their holsters and the handcuffs were removed. It was only at that point that defendant was asked if he would be willing to answer questions.

**E. The court's ruling on the traffic stop**

The court held that while the initial traffic stop and detention were illegal, the deputies stopped defendant's truck in good faith, and the initial detention was not done in bad faith. "It wasn't stopped for some nefarious purpose or something along those lines. I think the People just got caught short on who the witness was going to be [at the evidentiary hearing on the suppression motion]."

The court also found that even though the initial detention was illegal, there was attenuation between that detention and defendant's consent to the interview, because defendant was removed from the patrol car, the handcuffs were removed, the situation was explained to him, and he agreed to answer questions. The court noted that the detention was over, and defendant was specifically told that the detectives could come to the scene or go to the sheriff's department, and he agreed to go there on his own. "He was not handcuffed,... the detention was over, but he still went down there voluntarily." "Therefore, there was an attenuation. When [defendant] was told 'We want to talk to you, we will talk to you here, we will talk to you there,' he freely chose to go. So the mere fact he was illegally detained ... will not cause this court to suppress whatever happened at the station."

**F. Attenuation**

Defendant contends that since the trial court found the initial traffic stop and detention were unlawful, it should have granted his motion to suppress his subsequent statements to Lackey and Olmos, and the statements were improperly relied upon in the search warrant affidavit because they were the fruits of the illegal detention. Defendant further argues that when his statements are omitted from the affidavit, it fails to

state probable cause to support the search warrant issued for defendant's house, and the evidentiary items seized from his house—particularly the bloody shirt and the pearl earring—should have been suppressed.

"The scope of our review of constitutional claims of this nature is well established. We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]" (People v. Boyer (1989) 48 Cal.3d 247, 263, disapproved on another ground in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1.)

The exclusionary rule extends to the fruits of an illegal search or seizure. (Wong Sun v. United States (1963) 371 U.S. 471, 488 (Wong Sun).) "Because of the particular interests protected by the Fourth Amendment, a statement must be suppressed, even when knowing, voluntary, and intelligent, if it is the direct product of an illegal arrest or detention. [Citations.]" (People v. Boyer, supra, 48 Cal.3d 247, 267.)

However, "suppression is not necessarily required *even if* the evidence would not have come to light but for an infringement of the defendant's Fourth Amendment rights. [Citation.]" (People v. Boyer (2006) 38 Cal.4th 412, 448, italics in original.) "[N]ot ... all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation.]" (Wong Sun, supra, 371 U.S. at pp. 487-488; People v. Sims (1993) 5 Cal.4th 405, 445.) "'Under Wong Sun, evidence is not to be excluded merely because it would not have been obtained but for the illegal police activity. [Citation.] The question is whether the evidence was obtained by the government's exploitation of the illegality or whether the illegality has become attenuated so as to dissipate the taint. [Citation.]' [Citation.]" (People v. Boyer, supra, 38 Cal.4th 412, 448; see also United States v. Crews (1980) 445 U.S. 463, 471.)

"Relevant factors in this 'attenuation' analysis include the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct. (Brown v. Illinois (1975) 422 U.S. 590, 603-604 ... (Brown).)" (People v. Boyer, supra, 38 Cal.4th at p. 448; People v. Brendlin (2008) 45 Cal.4th 262, 269.) "The degree of attenuation that suffices to dissipate the taint 'requires at least an intervening independent act by the defendant or a third party' to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality. [Citations.]" (People v. Sims, supra, 5 Cal.4th at p. 445.) The prosecution bears the burden of showing the evidence is

not the fruit of the illegal detention and is therefore admissible. (<u>People v. Boyer</u>, supra, 38 Cal.4th at p. 449.)

**G. Analysis**

We find that the trial court properly denied defendant's motion to suppress his statements because those statements were sufficiently attenuated from the initial illegality of the unlawful detention. In making this determination, we review the three <u>Brown</u> factors, i.e., the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct. (<u>Brown</u>, supra, 422 U.S. at pp. 603-604; <u>People v. Brendlin</u>, supra, 45 Cal.4th at p. 269.)

The first <u>Brown</u> factor is the temporal proximity of the unlawful detention to the procurement of the challenged evidence, i.e., defendant's statements. (<u>Brown</u>, supra, 422 U.S. at p. 603.) It is undisputed that a few minutes passed between the time that deputies stopped the truck, detained defendant, placed him in handcuffs and in the back of the patrol car, and when Deputy Voth removed him from the patrol car and removed the handcuffs. The record is silent as to how much time elapsed from defendant's conversation with Deputy Voth, when he agreed to the interview, and when he was transported to the sheriff's department for the interview itself. However, it is undisputed that the sheriff's department was less than a mile away from the scene of the traffic stop, and the record thus implies that a short period of time passed between those events.

In any event, a relatively short period of time passed between the initial detention and defendant's interview with the two detectives. While this factor may tend to favor suppression, it is not dispositive of the issue. (<u>Brown</u>, supra, 422 U.S. at p. 603; <u>People v. Brendlin</u>, supra, 45 Cal.4th at p. 270.)

The second <u>Brown</u> factor is the presence of intervening circumstances. (<u>Brown</u>, supra, 422 U.S. at pp. 603-604.) There were several intervening circumstances which establish attenuation in this case: the deputies returned their weapons to their holsters; defendant was removed from the patrol car; the handcuffs were removed from him; he remained outside the patrol and he was never again placed in restraints; Deputy Voth explained to defendant that he was not under arrest, and that detectives wanted to talk to him about a homicide; defendant said he already knew that Detective Lackey wanted to talk to him; Voth asked defendant if he wanted to speak with the detectives; defendant said yes; Voth offered to have the detectives talk to him at the scene or he could go to the sheriff's department; Voth explained defendant did not have to go with them and it was voluntary; defendant said he would go to the sheriff's department; Voth offered him a ride; and defendant accepted the ride.

All of these intervening circumstances attenuated the taint of initial

unlawful detention. Defendant was no longer in custody and was advised that he was not under arrest and that he did not have to answer questions. Defendant replied that he knew Detective Lackey wanted to talk to him about a homicide, and he accepted the offer of a ride to the sheriff's department.

As for the third <u>Brown</u> factor, the deputies' conduct was not particularly flagrant given the circumstances of this case. As noted by the trial court, the prosecution seemed unprepared at the time of the evidentiary hearing on the suppression motion and failed to call the deputies who actually conducted the initial traffic stop. Nevertheless, Deputy Voth testified that they had been informed that defendant was wanted for questioning in a homicide that involved a firearm, and the firearm had not been found. Such information might explain the reasons the deputies drew their weapons when they conducted the traffic stop. Indeed, Deputy Voth explained that he removed the handcuffs from defendant as soon as he conducted the patdown search and ensured that defendant did not possess a weapon. Defendant was advised within minutes that he was not under arrest, the handcuffs were unlocked, and he was removed from the patrol car.

Based on the <u>Brown</u> factors, there is sufficient evidence of attenuation such that defendant's subsequent statements to Detective Lackey and Olmos were not the fruits of the initial unlawful detention. The trial court properly denied defendant's motion to suppress his statements as reflected in the search warrant affidavit.

**III. Denial of the motion to traverse**

Defendant next contends that, independent of his motion to suppress his statements to the detectives that were used in the search warrant affidavit, the court should have granted his separate motion to traverse and quash the search warrant. Defendant argues the search warrant affidavit contained material misstatements and omitted relevant facts about the homicide investigation and defendant's purported connection to Meas.

**A. Motions to traverse**

We begin with the well-settled rules on motions to traverse a search warrant. "There is ... a presumption of validity with respect to the affidavit supporting the search warrant." (<u>Franks v. Delaware</u> (1978) 438 U.S. 154, 171 (Franks).)

In <u>Franks</u>, however, the United States Supreme Court held that "a defendant may challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. When presented with such a challenge, the lower courts must conduct an evidentiary hearing if a defendant makes a substantial

showing that: (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to justify a finding of probable cause." (People v. Bradford (1997) 15 Cal.4th 1229, 1297 (Bradford).)

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient." (Franks, supra, 438 U.S. at p. 171.)

"At the evidentiary hearing, if the statements are proved by a preponderance of the evidence to be false or reckless, they must be considered excised. If the remaining contents of the affidavit are insufficient to establish probable cause, the warrant must be voided and any evidence seized pursuant to that warrant must be suppressed. [Citation.]" (Bradford, supra, 15 Cal.4th at p. 1297.)

"[T]wo types of correction are envisioned in Franks: (1) material misstatements are stricken and (2) material omissions are added. The aim in either case is not punitive but remedial — to make the affidavit read as it should have so that the reviewing court can then retest for probable cause support. [Citations.]" (People v. Costello (1988) 204 Cal.App.3d 431, 443.)

Defendant bears the burden of showing the allegedly false statements and/or omissions were material to the determination of probable cause. (Bradford, supra, 15 Cal.4th at p. 1297.) Materiality is evaluated by the test of Illinois v. Gates (1983) 462 U.S. 213, "'which looks to the totality of the circumstances in determining whether a warrant affidavit establishes good cause for a search. [Citation.]' [Citation.]" (Bradford, supra, 15 Cal.4th at p. 1297.)

We will uphold a trial court's finding as to the falsity or recklessness of an affidavit statement if supported by substantial evidence. (People v. Costello, supra, 204 Cal.App.3d at p. 441.) The materiality of any affirmative misrepresentations and/or omissions is a question of law. (Wood v. Emmerson (2007) 155 Cal.App.4th 1506, 1524.)

With these standards in mind, we turn to the facts and circumstances of defendant's motion to traverse the search warrant.

**B. The search warrant affidavit**

21

As set forth ante, Meas disappeared and her body was found on the morning of October 13, 2008. On the morning of October 15, 2008, Detectives Lackey and Olmos interviewed defendant after he was detained during the traffic stop. Defendant was not arrested at that time.

Later on October 15, 2008, Detective Olmos prepared a six-page affidavit in support of obtaining a search warrant for defendant's house. The affidavit stated that Meas's body had been found on the dirt access road, that she had two gunshots to the head, that she had worked at the Shell store on Airport Drive, and that her house was adjacent to the store.

The affidavit stated that detectives had reviewed the video surveillance tapes at the Shell store, which also showed part of Meas's house, and they saw "a male subject walking in front of Meas'[s] garage" around 2:58 a.m. on October 13, 2008; he walked in front of her garage; and it appeared he walked into her backyard. About 10 minutes later, the male subject "has his arms wrapped around Meas as she is struggling to get away from him." The man "appeared to be about average height and medium build."

The affidavit stated that Meas was getting ready for work and to open the store at 3:00 a.m. Meas's husband was not home and his employer confirmed he was already at his own job when Meas disappeared.

The affidavit gave the following information about a possible suspect named "Jeff."**[FN8]**

> "We spoke to several employees [at the Shell store] who told us a male subject by the name of 'Jeff' had been harassing Meas for the past several months. Jeff was sending her flowers to her workplace and calling her on her cell phone. It is unknown at this time how Jeff obtained Meas'[s] cell phone number. Jeff was a regular customer of the store and according to [Meas's] co-workers, Jeff was infatuated with Meas. Jeff frequented the store and would solicit Meas for a date, which Meas would decline. Meas received flowers from Log Cabin Florist at her work place. Detectives received invoices from Log Cabin Florist and confirmed that a 'Jeff' had ordered over three hundred dollars in flowers and vases and had them sent to the Shell Gas Station to Meas. Detectives were able to obtain Jeff's cell phone number through these invoices.... These purchases were made over a three month period. According to co-workers, Meas did not ask Jeff for the gifts nor did she solicit him for a date. Co-workers also believe she was not having an extra marital affair with Jeff.

"The most recent visit from Jeff was on 10-12-08 at about 0437 hours. On that date and time, co-workers of Meas told Detectives that Jeff was harassing Meas at the check out counter. The harassment became so overt and aggressive that customers were telling Jeff to leave her alone. Jeff eventually left the store. Meas was continuing to receive phone call[s] from Jeff. It is unknown how often Jeff called Meas. Through video surveillance of the store on 10-12-08, Detectives reviewed the recordings and saw that Jeff had visited the store six times on that particular day between 0437 hours and 0637 hours on 10-12-08. Each time Jeff went into the store, he purchased drinks and stood near the check out counter speaking to Meas for several minutes. Meas was the only employee in the store at the time."

**FN8**. We are quoting these paragraphs in their entirety because, as we will explain post, defendant claims these paragraphs contain material misstatements as to the detectives' investigation about the existence of "Jeff."

The affidavit stated that detectives identified defendant as "Jeff," they showed his photograph to Meas's coworkers, and "[s]everal employees" identified him as the person who Meas knew as Jeff.

"Detectives have been unable to locate [defendant] as of this time. Detectives are conducting constant surveillance on his residence. Since the time of the homicide, [defendant] has not returned home."

The affidavit stated that defendant's employer reported that defendant arrived at work at 5:00 a.m. on October 13, 2008, but he called into work on October 14, 2008, because "'something came up.'" The detectives spoke to defendant's family, who said he had not made contact when them for about 10 days.

"The male subject on the video recording that abducted and possibly murdered Meas has similar physical qualities as [defendant]. [Defendant] is about 5'8" and about 150-160 lbs. [Defendant] lives in close proximity to Meas. [Defendant] was obsessed with Meas to the point that he visited her frequently at her place of employment and harassed her. [Defendant] bought Meas unsolicited gifts and harassed [her] through her cell phone by calling her frequently. [Defendant] has not been home since the homicide of Meas.... I also believe [defendant] is deliberately avoiding contact with Sheriff's Detectives."

The affidavit stated that detectives had left business cards at defendant's door with messages to contact them. The detectives went to

defendant's house on the afternoon of October 14, 2008, where they saw two females arrive in a vehicle. They later learned one of the women was defendant's adult daughter, and she went into the house. The detectives approached the vehicle, but the driver pulled away "in an evasive manner," and defendant's daughter also left the premises.

"Based on the fact that [defendant] has deliberately avoided contact with Sheriff's Detectives, he has not shown up to work by calling in sick, has not returned home since the day of the homicide, and the fact that family members who were previously notified of our attempt to question him are now being evasive with Sheriff's Detective, has led me to believe that [defendant] is highly suspect in this investigation."

The affidavit further stated that detectives obtained a search warrant on October 14, 2008, to locate a triangulation site for defendant's cell phone, and there was a "[p]ing-hit" at the time the car with the two women were at defendant's house. The detectives went to the house of defendant's mother, there were cars in the driveway and lights on, but no one answered the door.

The affidavit then set forth the circumstances of finding defendant and his truck on the morning of October 15, 2008. At 5:30 a.m., deputies were watching defendant's house and saw a white truck parked in the driveway. The truck matched the description of defendant's vehicle. A man walked out of the house, entered the truck, and drove away. The deputies followed the truck, conducted an investigative stop, and confirmed defendant was the driver. Defendant was asked if he would agree to an interview, and he agreed and "freely and voluntarily" went to the sheriff's department for the interview.**[FN9]** After defendant left the site of the traffic stop, the detectives examined his truck and "saw what appeared to be blood splatter on the front passenger side portion" of the truck.**[FN10]** The affidavit summarized defendant's interview with the detectives, as set forth in section II, ante.

**FN9**. As explained in section II, ante, the affidavit omitted the precise details about how the traffic stop was performed and defendant was removed from the truck.

**FN10**. As we will explain post, the detectives thought there was blood on the truck at the time the affidavit was prepared; tests later clarified the substance was not human blood.

The affidavit concluded as follows:

"Based on the aforementioned facts that [defendant] has deliberately avoided contact with Sheriff's Detectives, he has not shown up to work by calling in sick, has not returned home since the day of the homicide, and the fact that family

members who were previously notified of our attempt to question him are now being evasive with Sheriff's Detectives, has led me to believe that [defendant] is highly suspect in this investigation. I also believe evidence pertinent to this investigation is inside his residence that is going to further assist Detectives in this investigation, since he was seen at his residence after being missing for the last 48 hours [prior] to being stopped and the fact that he possibly went home after the homicide."

**C. Search of defendant's house**

As explained in the factual statement, ante, the warrant was issued and defendant's house was searched pursuant to the warrant on October 15, 2008. The detectives found a blood-stained shirt which contained Meas's DNA; the matching pearl earring which contained Meas's DNA; the police scanner defendant bought the day before the homicide; an empty box for a nine-millimeter Glock; and other weapons and ammunition. Defendant's computer was also seized and numerous search inquires were found about dating Asian and/or Cambodian women.

**D. Defendant's motion to traverse**

In addition to his motion to suppress, discussed in section II, ante, defendant also filed a pretrial motion to traverse and quash the search warrant. Defendant argued that Detective Olmos, the affiant, made "at least twelve material mis-statements of facts [in the affidavit] that are properly characterized as either willfully false or made with reckless disregard for the truth." Defendant requested the court conduct an evidentiary hearing pursuant to Franks, and then strike the alleged misstatements. Defendant argued that once the alleged misstatements were stricken, the affidavit failed to state probable cause to search defendant's house, and the entirety of the evidence seized from defendant's house would have to be suppressed.

Defendant's motion set forth 12 specific areas where the search warrant affidavit allegedly contained material misstatements, and one material omission, to conduct a Franks hearing to traverse the affidavit. The court conducted a two-part hearing on the motion, reviewed each of defendant's allegations, and made specific findings as to whether each allegation raised a prima facie case for a Franks hearing. The court found some, but not all, of defendant's allegations justified a Franks evidentiary hearing.

**E. The affidavit's statements about defendant's alleged relationship with Meas**

Defendant's motion to traverse asserted there were four specific areas in the search warrant affidavit which contained material

misstatements about the nature of defendant's relationship with Meas:

> 1. Defendant argued that Detective Olmos, the affiant, falsely claimed the detectives spoke to "'several employees'" who said a male named "'Jeff'" had harassed Meas for several months, called her cell phone, and asked her for a date. Defendant asserted that Detective Lackey introduced the name "Jeff" into the investigation and no one said that anyone was harassing Meas.

> 2. The affiant falsely claimed "Jeff" harassed Meas at the store on the day before the homicide, and that customers had to tell him to leave her alone. Defendant argued the statement was a complete lie.

> 3. The affiant falsely claimed defendant was "obsessed" with Meas, he frequently visited the store and harassed her, and he called her cell phone. Defendant argued there was no evidence that defendant harassed Meas or called her cell phone.

> 4. The affiant falsely and recklessly claimed "Jeff" solicited Meas for a date and she declined. Defendant argued there was no evidence that happened.

The court held defendant made a prima face case for a <u>Franks</u> evidentiary hearing only as to these four alleged material misstatements as to the nature and sources of information about defendant's relationship with Meas. The court noted the "tenor" of the affidavit was that defendant had or attempted to have some type of relationship with Meas, things did not go as he wanted, and a death resulted.

The court thus conducted a <u>Franks</u> evidentiary hearing on the four allegations in defendant's motion to traverse, as to the affidavit's description of the nature of defendant's relationship and conduct with Meas. The court denied defendant's motion for an evidentiary hearing as to the other allegations of misstatements and omissions.**[FN11]**

> **FN11**. Defendant's motion to traverse also alleged the affidavit contained five additional material misstatements, but the court declined to conduct a hearing on these allegations. These allegations involved the incorrect time stamps on the video surveillance tapes (the court noted that during a previous pretrial hearing, an explanation had been provided about the two-hour differential in the time stamps); the statements that the detectives did not know defendant's whereabouts even though the affidavit also stated that they had interviewed him the previous day (the court found the entirety of the affidavit clarified that point); whether the

detectives prepared a report about their interview with the employer of Meas's husband, to confirm he was at work when she disappeared (the court found the absence of a report did not mean that the matter was not investigated); the affidavit's failure to explain the exact nature and circumstances of the traffic stop (the court found it had already ruled on the admissibility of defendant's statements when it denied his motion to suppress); and why defendant matched the "average" build of the man seen on the videotapes (the court acknowledged that someone may have an "average" build and thus match the suspect depicted on the videotapes).

Defendant's motion also alleged one material omission, based on the affidavit's failure to state that that both Detectives Olmos and Lackey allegedly "enjoyed an unusual relationship" with Meas, and they regularly and repeatedly visited her store every day. The court found the nature of the detectives' relationship with Meas was irrelevant to the review of the search warrant affidavit.

The court found defendant failed to provide a sufficient basis for a <u>Franks</u> hearing on these other points. Nevertheless, defendant tried to question the detectives on some of these issues. In any event, on appeal, defendant has not challenged the court's decision not to conduct a <u>Franks</u> hearing on the other five alleged misstatements and the one omission.

## F. The <u>Franks</u> evidentiary hearing

Several witnesses testified at the <u>Franks</u> evidentiary hearing as to the nature and source of the detectives' information about the existence of "Jeff" and defendant's relationship with Meas, as summarized in the search warrant affidavit.

## Detective Lackey

Detective Lackey testified that on the morning of the homicide, he was assigned to be the lead detective on the case and did not assign himself to the investigation.**[FN12]** Lackey testified about an incident that occurred when he was at the store prior to the homicide: "[A] guy named Jeff" sent flowers to Meas at the store and "they were wondering who it was." Lackey testified the flowers were on the desk, and Meas's coworker pointed them out to Lackey and said, "'Oh, look what [she] got.'" Lackey testified that Meas "asked me if I knew who Jeff was."

**FN12**. During the <u>Franks</u> hearing, Lackey was asked about the nature of his relationship with Meas and other topics,

even though the court had limited the subject matter of the Franks hearing to the identification of "Jeff." As to his relationship with Meas, Lackey's testimony was consistent with his subsequent trial testimony on the topic: he knew Meas because he regularly went to the Shell store on his morning breaks, it was just three blocks from the sheriff's department, and he used to talk and visit with her. Lackey had diabetes and could not drink sodas, and the Shell store carried iced tea, which he could drink. Lackey also took afternoon breaks at the store, but he usually did not see Meas then. Lackey testified he did not have any romantic interest in Meas.

Lackey also testified the time stamps on the surveillance videotapes were off by two hours. Lackey testified he did not prepare a report about speaking with the employer of Meas's husband to determine his whereabouts.

Lackey testified that after his initial conversation with Meas about the flowers, he "used to tease her about it quite a bit. 'Have you heard from Jeff lately? Did Jeff send you any more flowers?' In fact, this Jeff, unidentified Jeff at the time, did, in fact, send her flowers again."

Lackey testified that after the homicide, he interviewed Melissa Chao about whether Meas was being bothered at the store. Chao said Meas told her that someone at work had bothered her, but Chao did not know that person's identity. Lackey asked Chao if she knew who Jeff was and reminded Chao that Meas received flowers at work. Chao remembered that Meas received flowers, but she did not have any more information about that person. Chao also said that Meas was concerned about two people who came into the store the day before the homicide.

Lackey testified he did not know Jeff's full name before the homicide, and developed information about this person during the investigation. On the same day that Lackey spoke to Chao, he determined that defendant sent flowers to Meas on two different occasions. Lackey conceded that Chao never said that Meas was concerned that Jeff sent her flowers.

Lackey testified he provided some of the information which Olmos included in the affidavit, but he did not help Olmos write the affidavit. He assumed Olmos asked him to read it over after he finished it, but he could not specifically remember doing so.

**Detective Olmos**

Detective Olmos testified he also knew Meas because he regularly visited the Shell store with Lackey, his partner. Olmos prepared the search warrant affidavit after he reviewed the reports prepared by other

investigators and exchanged information with Lackey. Olmos testified that he met with Lackey before he wrote the affidavit, and "we went over what needed to be placed into the affidavit."

Olmos testified that he spoke to Chao, Meas's coworker.**[FN13]** Chao said that Jeff came to the store and talked to Meas. Chao also said that Meas received flowers at the store from Jeff more than once. Chao said that she knew someone as "Jeff," and he would make his purchases and then stare at Meas before leaving. Chao said Jeff frequently came to the store in a red sports car. Chao said that Meas never talked about Jeff or expressed concern about him, and she never said that Jeff frequently called her. Chao believed that Meas was not concerned about Jeff at the time of her death.

> **FN13**. Defendant speculates that "Melissa" Chao and "Lisa" Chao are two different people. When Olmos was asked about which employees he interviewed, he testified that he spoke to Jennifer Ferguson and "Melissa and Lisa Chao or Melissa Chao." Olmos also said that he spoke "to Lisa and Melissa." At trial, however, only Melissa Chao testified and there was no evidence about another person.

Olmos testified that on the day that Meas's body was found, he spoke with Jennifer Ferguson, another Shell store employee. Jennifer said that someone named "Jeff" regularly came into the store, and he drove a red sports car. Jennifer said someone had been calling Meas. Jennifer thought that person was Jeff, but she was not sure. Jennifer also thought Jeff asked Meas for a date at least once, and Meas declined. Olmos explained he did not prepare a report about his conversation with Jennifer because he thought another deputy had already interviewed her. Olmos testified that Jennifer was the only source of his information in the affidavit about Jeff asking Meas for a date.

Olmos was asked if any other employee said that Jeff was "harassing" Meas. Olmos replied: "Well, it depends on what definition of harassing you are looking for. Harass to me was bothering somebody persistently, which was just a synthesized word I used when I had spoken to Lisa and Melissa." Olmos testified that he used the words "harassing" and "obsession" in the affidavit based on Jennifer's information about Jeff. One of the employees, possibly Jennifer, also told Olmos that Jeff harassed Meas the day before the homicide, and the harassment was so severe that other employees intervened.

Olmos thought Jennifer and/or another employee were also the source of his information that defendant harassed her at the store on the day before the homicide, and that customers told him to leave her alone. Olmos had not reviewed the videotapes at the time he spoke with Jennifer. Olmos testified that Lackey reviewed the videotapes and gave him the information which he included in the affidavit, that Jeff repeatedly

went to the store on the day before the homicide.

Olmos testified he also spoke to other deputies about their investigation into the homicide, and relied on their information to prepare the affidavit. Deputy Todisco told Olmos that "[h]e found what he believed to be blood or brain matter on the front fender of the white pickup truck that [defendant] was stopped in." Olmos admitted that after defendant's house was searched, the substance from his truck was subsequently analyzed, and it was not human.

**G. The court's ruling**

The court denied defendant's motion to traverse and quash the search warrant. The court found the witnesses were honest and direct, and they were not trying to hide anything. While defendant made a prima facie case to conduct the <u>Franks</u> hearing, the court clarified that it did not find the officers engaged in reckless or intentional misconduct in the preparation of the search warrant affidavit.

"I do note, though, that Detective Olmos talked about—I think it was—her name was Jennifer who he did not use her name and he did not write a report on because he thought other deputies had. *And the paragraphs in the affidavit that speak of co-workers talking about this Jeff harassing the victim, that should be stricken. It should be co-worker. I think the evidence is that there was—well, in some instances it's multiple, but in this one instance when he testified about Jennifer....* [¶]...[¶] ... She was the one who made some of these allegations or made some of these statements. *But even with those changes in the affidavit, when you read this affidavit as a whole, even with all those complaints that [defense counsel] puts forward, the affidavit—the magistrate still would have signed this affidavit.* There is plenty of evidence in this affidavit that the magistrate would still— would have signed this search warrant. And I think there is sufficient evidence to uphold that." (Italics added.)

**H. Analysis**

Defendant argues the affidavit contained "fictionalizations and gross exaggerations designed to make [him] look like a dangerous stalker," particularly as to Olmos's admission that he characterized defendant's conduct as "harassment" based on "synthesizing" the evidence he had received. Defendant argues that "such fictionalizations" were not accidental, and the trial court should have stricken the misstatements from the affidavit and retested it for probable cause. We note, however, that the court discounted the affidavit's description of defendant's alleged harassment of Meas on the day before the homicide, particularly as to whether other coworkers and/or customers had to

intervene. The court instead focused on Jennifer Ferguson's statements to Olmos about Jeff's conduct toward Meas, and decided that the affidavit still contained probable cause to search defendant's house.

In any event, we find the trial court properly denied defendant's motion to traverse as to the affidavit's identification of "Jeff," and the description of the nature of defendant's relationship and conduct toward Meas. "'[T]he warrant can be upset only if the affidavit fails as a matter of law ... to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause ...." (People v. Thuss (2003) 107 Cal.App.4th 221, 235.) Probable cause to search exists when, based upon the totality of the circumstances described in the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Illinois v. Gates, supra, 462 U.S. at p. 238; People v. Farley (2009) 46 Cal.4th 1053, 1098.) "Probable cause '"means less than evidence which would justify condemnation.... It [describes] circumstances which warrant suspicion."' [Citations.] Probable cause, unlike the fact itself, may be shown by evidence that would not be competent at trial. [Citation.] Accordingly, information and belief alone may support the issuance of search warrants, which require probable cause. [Citations.]" (Humphrey v. Appellate Division (2002) 29 Cal.4th 569, 573.)

While the trial court properly found that the affidavit overstated the nature and source of the detectives' information about Jeff's conduct toward Meas, the detectives' testimony at the evidentiary hearing clearly explained the source for their information about Jeff's activities. Detective Olmos explained that Jennifer Ferguson, Meas's coworker, was the primary source for the information that Jeff asked Meas for a date. Jennifer thought he regularly called Meas, and he "harassed" her the day before the homicide. The court correctly discounted Olmos's use of the word "harass," particularly whether other employees and/or customers had intervened to prevent Jeff's alleged harassment of Meas on the day before the homicide.

Defendant complains that Detective Lackey introduced Jeff's name into the investigation, and he reminded Chao that Jeff sent flowers to Meas. Defendant points out that there was no evidence that Meas was concerned or worried about Jeff's conduct or alleged attention toward her. Nevertheless, defendant never introduced any evidence to undermine the affidavit's statement that Jeff ordered flowers from Log Cabin Florists for delivery to the Shell station. While Jeff may not have "harassed" Meas on the day before the homicide, defendant also failed to undermine the affidavit's statement that Jeff walked around and repeatedly entered the store that day. More importantly, defendant failed to undermine the affidavit's statement that detectives showed defendants photograph to Meas's coworkers and they identified him as Jeff.

Thus, even when the affidavit's description of defendant's alleged "harassment" is stricken, it still states probable cause to search

1
2
3
4
5
6
7

defendant's house: defendant was identified as the "Jeff" who regularly went to the store, he sent expensive flower arrangements to Meas, Jennifer Ferguson said that he asked Meas for a date and she declined, Jennifer knew someone had been calling Meas and thought it was Jeff, and he repeatedly went to the store on the day before the homicide. Moreover, defendant failed to return to work the day after the homicide, he had not been seen at his house, he failed to respond to the detectives' cards to call them, his adult daughter attempted to evade the deputies when she arrived at defendant's house, defendant's cell phone "pinged" at the time that his daughter was at his house, and defendant appeared to have the same height and build as the man depicted in the videotapes who forcibly removed Meas from her house.**[FN14]**

8
9
10
11
12
13
14
15
16
17

> **FN14**. In section II, we found that defendant's statements to the detectives during the October 15, 2008, interview were sufficiently attenuated from the initial illegal traffic stop and properly relied upon in the search warrant affidavit. We note that defendant's statements during that interview did not add much to the affidavit, since he confirmed that he sent gifts to Meas. However, defendant also said that Meas told him where she lived, said she was single, and she was flirtatious. In any event, we further find that even if defendant's interview with the detectives on October 15, 2008, should have been suppressed as the fruits of the initial unlawful traffic stop, and thus excised from the search warrant affidavit, that the affidavit still contained probable cause to support issuance of the search warrant for defendant's house based on the balance of the factors we have discussed.

18
19

People v. Chitwood, 2012 Cal. App. Unpub. LEXIS 1326, 22-66 (Cal. App. 5th Dist. 2012)

20
21
22

After his petition with the California Court of Appeal was denied, Petitioner then filed for review with the California Supreme Court.  That petition also was denied. The California Supreme Court is presumed to have denied the claim for the same reasons stated by the lower court.  Ylst, 501 U.S. at 803.

23
24
25

Respondent asserts that based on Petitioner's full and fair opportunity to litigate his Fourth Amendment claims in state court, this Court should deny his federal habeas petition. For the reasons set forth below, the Court agrees with Respondent's assertion.

26
27
28

It is well-settled that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal

1  habeas corpus relief on the ground that evidence obtained in an unreasonable search or

2  seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494 (1976). Stone is

3  a "categorical limitation on the applicability of fourth amendment exclusionary rules in

4  habeas corpus proceedings." Woolery v. Arave, 8 F.3d 1325, 1328 (9th Cir. 1993). If a

5  petitioner fails to show that the state court did not offer him a full and fair opportunity to

6  litigate his fourth amendment claim, it "must be dismissed." Id.

7         In determining whether Stone bars a petitioner's Fourth Amendment claims, the

8  relevant inquiry is whether a petitioner had the opportunity to litigate his claims, not

9  whether he did, in fact, do so, or whether the claims were correctly decided. See, e.g.,

10  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); Gordon v. Duran, 895 F.2d

11  610, 613 (9th Cir. 1990) ("Whether or not [the petitioner] did in fact litigate this fourth

12  amendment claim in state court, he did have the opportunity to do so"). The extent to

13  which the claim was briefed before and addressed by the state trial and appellate courts

14  also may be considered in assessing the fullness and fairness of the opportunity which

15  was provided to litigate the relevant claim. See Terrovona v. Kincheloe, 912 F.2d 1176,

16  1178-79 (9th Cir. 1990); see also Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir.

17  2005).

18         The policy behind the Stone Court's analysis is that the exclusionary rule is

19  applied to stop future unconstitutional conduct of law enforcement. Stone, 428 U.S. at

20  492. However, excluding evidence that is not untrustworthy creates a windfall to the

21  defendant at a substantial societal cost. See Stone, 428 U.S. at 489-90; Woolery, 8 F.3d

22  at 1327-28. Thus, the Ninth Circuit has described the rationale for this rule by saying:

23                    The holding is grounded in the Court's conclusion that in cases
24          where a petitioner's Fourth Amendment claim has been adequately
              litigated in state court, enforcing the exclusionary rule through writs of
              habeas corpus would not further the deterrent and educative purposes of
25          the rule to an extent sufficient to counter the negative effect such a policy
              would have on the interests of judicial efficiency, comity and federalism.
26
   Woolery, 8 F.3d at 1326; see also Stone, 428 U.S. at 493-494.
27
          Here, as described by the appellate court, Petitioner briefed and argued his
28

1  suppression motion at trial, and the trial court gave full consideration to the motion and

2  stated on the record its reasons for denying the motion. He presented the issue to the

3  California Court of Appeal, which issued a reasoned denial of the claim, and the

4  California Supreme Court affirmed the Court of Appeal upon review. Although the state

5  courts ruled against Petitioner, the record reflects that Petitioner was afforded a full and

6  fair opportunity to litigate his Fourth Amendment claims. Accordingly, the claims are not

7  cognizable on federal habeas review. See Stone, 428 U.S. at 481-82. Petitioner's first

8  and second claim for habeas corpus relief lack merit and must be denied.

9           **B.     Claims Three and Four: Ineffective Assistance of Counsel**

10          In his third and fourth claims, Petitioner asserts that his trial counsel was

11  ineffective for failing to offer an expert to present rebutting and potentially exonerating

12  DNA evidence. (Am. Pet. at 5, 12-22.) Petitioner asserts in his third and fourth claims

13  that trial counsel was ineffective for failing to further investigate DNA that belonged to a

14  third party and was found on the victim's clothing and because several samples of DNA

15  evidence may have been subject to cross-contamination.

16                 1.     Law Applicable to Ineffective Assistance of Counsel Claims

17          The law governing ineffective assistance of counsel claims is clearly established

18  for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

19  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas

20  corpus alleging ineffective assistance of counsel, the Court must consider two factors.

21  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry

22  v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's

23  performance was deficient, requiring a showing that counsel made errors so serious that

24  he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

25  Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell

26  below an objective standard of reasonableness, and must identify counsel's alleged acts

27  or omissions that were not the result of reasonable professional judgment considering

28  the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

1    (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court

2    indulges a strong presumption that counsel's conduct falls within the wide range of

3    reasonable professional assistance. Strickland, 466 U.S. at 687; see also, Harrington v.

4    Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

5        Second, the petitioner must demonstrate that "there is a reasonable probability

6    that, but for counsel's unprofessional errors, the result ... would have been different,"

7    Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so

8    egregious as to deprive defendant of a fair trial, one whose result is reliable. Id. at 687.

9    The Court must evaluate whether the entire trial was fundamentally unfair or unreliable

10   because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1348; United

11   States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

12       A court need not determine whether counsel's performance was deficient before

13   examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

14   Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any

15   deficiency that does not result in prejudice must necessarily fail. However, there are

16   certain instances which are legally presumed to result in prejudice, e.g., where there has

17   been an actual or constructive denial of the assistance of counsel or where the State has

18   interfered with counsel's assistance. Id. at 692; United States v. Cronic, 466 U.S., at 659,

19   and n.25 (1984).

20       As the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the

21   standard for ineffective assistance of counsel in federal habeas is extremely difficult:

22       The pivotal question is whether the state court's application of the
         Strickland standard was unreasonable. This is different from asking
23       whether defense counsel's performance fell below Strickland's standard.
         Were that the inquiry, the analysis would be no different than if, for
24       example, this Court were adjudicating a Strickland claim on direct review
         of a criminal conviction in a United States district court. Under AEDPA,
25       though, it is a necessary premise that the two questions are different. For
         purposes of § 2254(d)(1), "an unreasonable application of federal law is
26       different from an incorrect application of federal law." Williams, supra, at
         410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a
27       deference and latitude that are not in operation when the case involves
         review under the Strickland standard itself.

28       A state court's determination that a claim lacks merit precludes federal

1
2
3
4
5
6

> habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

7

Harrington v. Richter, 131 S. Ct. at 785-86.

8
9
10
11
12
13
14
15

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 786. "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Id. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

16
17
18

Accordingly, even if Petitioner presents a strong case of ineffective assistance of counsel, this Court may only grant relief if no fairminded jurist could agree on the correctness of the state court decision.

19

2.    State Decision

20
21
22
23
24
25
26
27
28

Petitioner presented his claim of ineffective assistance of counsel in his collateral appeal in the form of a petition for writ of habeas corpus to the Kern County Superior Court. (Lodged Doc. 7.) The claim was denied in a reasoned decision by the Kern County Superior Court and summarily denied in subsequent petitions by the California Court of Appeal, Fifth Appellate District and the California Supreme Court. (See Lodged Docs. 8-10, 15-16.) Since the California Supreme Court denied the petition in a summary manner, this Court "looks through" the decisions and presumes the Supreme Court adopted the reasoning of the Kern County Superior Court, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991)

(establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the Superior Court explained that:

> Petitioner alleges that his counsel was ineffective for failure to hire an expert to rebut the DNA evidence used to implicate him.
>
> He cites a letter by Elizabeth Johnson who contended that some of the DNA was contaminated. However, ultimately she concurred with the Kern County District Attorney's crime laboratory DNA report. Petitioner contends that the prosecution prevented his counsel from introducing third-party liability evidence. Petitioner contends that he is innocent of the crime. Finally, he asserts that his appellate counsel was ineffective for failure to assert these grounds on appeal.
>
> …
>
> Upon investigation, detectives found several incidents which raised suspicsion toward Petitioner:
>
> 1. Petitioner continually called Ms. Meas's cell-phone, and other customers who frequented the gas station found him lurking around the counter. Petitioner asserted that Ms. Meas was single, though she was in fact married. Petitioner purchased at least flower bouquets from Log Cabin Florists unsolicited by Ms. Meas. Ms. Meas' daughter, Melissa mentioned that a man named Jeffrey sent the flowers to Ms. Meas. Ms. Meas brought this matter to Detective Lackey's attention when he frequented the station prior to the murder.
>
> 2. Although petitioner appeared at work on October 13, 2008, he failed to appear the following say, nor on the day of his arrest. This is significant because he only showed up at the construction on the first day on the job, October 13, 2008.
>
> 3. Detective Haislip interviewed a Glen Osborne, who implicated petitioner in the murder because petitioner admitted to killing Ms. Meas when he spent the night with Mr. Osborne on October 14, 2008.
>
> 4. Detectives, Lackey, Olmos, among others left their business cards at petitioner's address to contact them. Petitioner did not do so until his arrest on October 15, 2008 during a traffic stop. The probable cause affidavit supporting the search warrant of petitioner's premises stated that petitioner voluntarily agreed to speak with detectives. However, it appears that Kern County Sheriffs' placed petitioner in handcuffs prior to placing him in the patrol car. The appellate court found improper police conduct.

5. A subsequent search of petitioner's house revealed not only the murder weapon, but also various firearms including a rifle. Detective Olmos found a pear earring on the floor which matched an earring worn by Ms. Meas when she was murdered. A subsequent search of the truck revealed bloodstains matching those of Ms. Meas.

6. A search of petitioner's computer hard drive revealed extensive Google searches on what Cambodians liked. This tied in with the sending of flowers to Ms. Meas.

7. A subsequent DNA analysis found that petitioner's DNA was on Ms. Meas's underwear and on a condom used by petitioner. These enumerated factors constituted the evidence in the preliminary hearing on or about October 23, 2009. Consequently, petitioner was bound over to answer for the murder of Ms. Meas.

Petitioner's first contention is that his counsel, A. Konrad Moore, should have hired an expert to contest the DNA findings. He contends that the expert would have cast doubt on the prosecution's case. Petitioner cites a letter from Elizabeth Johnson dated May 2, 2010. Petitioner contends that Ms. Johnson found fault with possible contamination of DNA due to commingling of his DNA and that of Ms. Meas. Petitioner faults his counsel for failing to investigate this matter.

Generally, the failure to investigate meritorious defenses constitutes ineffective assistance of counsel. People v. Jackson (1980) 28 Cal.3d 264, 289. Petitioner faces two obstacles in his argument.

First, the consultant ultimately agreed with the criminalist in the laboratory analysis, though she expressed concern with possible contamination. It would be dangerous for counsel to put Ms. Johnson on the stand given her analysis. It is also understandable that Ms. Meas's DNA would comingle with that of petitioner's given his use of a condom and touching of her underwear. The second obstacle is that the fault DNA must fundamentally undermine that prosecution's case not cast doubt on it. Tipor v. Superior Court (1997) 52 Cal.App.4th 1359.

Here there is no doubt that petitioner's DNA was on several incriminating pieces of evidence used in the conviction. In People v. Cua (2011) 191 Cal.App.4th 582, the court held that the quality of DNA goes to the weight, not the admissibility of the evidence. It is proper for an expert to state that a DNA sample was attributed to the defendant. Here, the DNA report found DNA samples attributable to petitioner including that of Ms. Meas's underwear.

Petitioner fails to prevail on this first argument.

…

To prevail in a claim of ineffective assistance of counsel, petitioner must show that counsel's conduct fell below professional norms which caused prejudice. Petitioner must demonstrate that in the absence of prejudice, he would receive a more favorable outcome. Strickland v. Washington (1984) 466 U.S. 668, 694, 697. The court outlined why there was no ineffective assistance of counsel above by alluding to the

1
2
3

abundance of evidence used to convict petitioner. Counsel did everything in its power to defend petitioner through the filings of motions to suppress the information and suppress evidence incident to a  search. P.C. Sections 995, 1538.5; the filing of numerous motions in limine; the introduction of character evidence of petitioner's good character; and the arguments raised by appellate counsel albeit no avail.

4
5
6
7

Petitioner is entitled to adequate not perfect counsel. <u>People v. Jackson</u> (2009) 45 Cal.4th 662. Moreover, trial and appellate counsel need not raise merit less claims. <u>Knowles v. Mirzayance</u> (2009) 556 U.S. 173, <u>In re Robbins</u> (1998) 18 Cal.4th 770, 810, 812. The court finds no ineffective assistance of trial and appellate counsel on the grounds petitioner alleges.

8

(Lodged Doc. 8.)

9

3.      Analysis

10

11

12

Giving the state court decision appropriate deference, fair-minded jurists could disagree whether counsel fell below an objective standard of reasonableness, or, alternatively, that Petitioner was prejudiced by counsel's conduct.

13

14

15

16

17

18

19

20

In his third claim, Petitioner asserts that counsel failed to properly investigate and retest DNA evidence. (Am. Pet. at 12-14.) Petitioner claims that he discussed the DNA evidence with his counsel, and discovered that counsel had obtained independent consultation by an expert, Elizabeth Johnson. (<u>Id</u>.) Johnson noted that due to poor laboratory techniques, cross-contamination of certain samples might have occurred, and retesting could confirm if the prosecution's results were accurate. (<u>Id</u>.) Petitioner contends that counsel was ineffective for not requesting retesting of the state's evidence in light of Johnson's report.

21

22

23

24

25

26

Petitioner further argues that new DNA evidence would have additionally supported evidence presented by Petitioner that his DNA was not found on the victim's body; that DNA, saliva, and sperm found on the victim's panties belonged to an unknown third party; that no tire tracks or footprints linked Petitioner to the crime scene; that no DNA or fingerprints of the victim were found in Petitioner's truck; and that he did not possess the murder weapon. (Am. Pet. at 14.)

27

28

In his fourth claim, Petitioner asserts that counsel was ineffective in failing to follow up and perform testing regarding the third party DNA found on the victim's panties.

1   (Am. Pet. at 19.) Petitioner asserts that there was evidence that another person was also

2   harassing the victim at work, and speculates that the person is the contributor of the third

3   party DNA. (Id.)

4          First, with regard to Petitioner's claim that counsel was ineffective for not

5   requesting further testing regarding cross-contamination, the Court finds the state court

6   was not unreasonable in determining that counsel was not ineffective. The state court

7   found that the consultant generally agreed with the criminalist in the laboratory analysis,

8   but expressed concern regarding possible contamination. Having reviewed Johnson's

9   summary of her review of the DNA evidence, the Court agrees with the state court's

10  finding that the victim's DNA was on the earring found at Petitioner's house, that

11  Petitioner's underwear contained both Petitioner and victim's DNA, and that the

12  bloodstain on Petitioner's shirt contained both Petitioner and victim's DNA. (Traverse at

13  24-25.) Johnson noted that she agreed with the conclusions of the laboratory, but notes

14  that the lab engaged in poor practices that could have resulted in cross contamination.

15  (Id.) After describing how Petitioner's shirt and the victim's earring were tested together,

16  Johnson noted that there was not a fear of cross-contamination of the victim's DNA from

17  her earring to the stain on Petitioner's shirt because the amount of DNA on the earring

18  was too small to account for the DNA on the shirt. (Id.) On the other hand, Johnson

19  noted that retesting could confirm if there was any cross-contamination of the victim's

20  DNA onto Petitioner's underwear from when it was tested with the victim's panties. (Id.)

21         The state court's determination that counsel's performance did not fall below an

22  objective standard of reasonableness was not an unreasonable determination of federal

23  law. While Petitioner's consultant noted that at least one item, Petitioner's underwear,

24  might have suffered from cross-contamination, it was nonetheless reasonable not to

25  retest the evidence for DNA. First, the other DNA evidence, which Johnson did not have

26  concerns about cross-contamination, strongly implicated Petitioner in the crime. The

27  victim's earring, which tested positive for her DNA was found in Petitioner's residence.

28  Likewise, the victim's blood was found on Petitioner's shirt. Petitioner has not provided

1   any rational explanation how retesting would undermine the critical evidence of these

2   items, which implicate that Petitioner was in close contact with the victim despite his

3   argument that he was not.

4       While trial counsel could have had Petitioner's underwear retested, the Court

5   finds it reasonable for an attorney to make the professional decision not to retest the

6   evidence. The tests might have shown that cross-contamination occurred, but they also

7   possibly could have confirmed the presence of the victim's DNA on Petitioner's

8   underwear.

9       Based on the significant amount of evidence against Petitioner, it is likely and

10  reasonable that Petitioner's counsel decided not to focus his energies and resources on

11  hiring an expert to challenge the DNA evidence because he reasonably anticipated

12  Petitioner's DNA would be present on the items and a rebuttal expert would be of little

13  help in trying to show otherwise. Based on the large amount of evidence linking

14  Petitioner to the crime, hiring an expert would have been an unnecessary allocation of

15  resources.

16      Further, Petitioner claims that counsel was ineffective because the lead detective

17  planted evidence of the crime, namely the victim's earing in Petitioner's residence. (Am.

18  Pet. at 15.) Even if this was the case, it does not call into question counsel's failure to

19  retest the DNA evidence. Petitioner also claims that counsel was ineffective because

20  witness Glen Osborne provided false testimony in stating that Petitioner confessed to

21  him. (Id.) Again, the testimony of Osborne does not change the scientific evidence

22  presented, or make retesting of any of the DNA tests potentially more favorable to

23  petitioner.

24      Petitioner, in his third and related claim, asserts that counsel was ineffective for

25  failing to test third party DNA evidence to show that Petitioner was innocent of the crime.

26  (Am. Pet. at 19-20.) Petitioner asserts that despite finding that saliva from a third party

27  on the victim's panties, and despite the fact that trial counsel argued that that evidence

28  'exonerated' Petitioner, counsel was ineffective for failing to test the DNA to discover the

1    identity of the third person. (Id.) The Court disagrees. The presence of a third party DNA

2    source was helpful to Petitioner to argue that he was not involved of the murder of the

3    victim. However, Petitioner presents no arguments that would refute or otherwise

4    undermine the Prosecution's forensic evidence that placed the victim's blood on

5    Petitioner's clothing. Regardless of whether the third party DNA was tested, the other

6    DNA evidence created a strong inference that Petitioner was in contact with the victim

7    near the time of her death.

8         Accordingly, the state court's rejection of Petitioner's ineffective assistance of

9    counsel claims was neither contrary to nor an unreasonable application of Strickland.

10   See Harrington, 131 S. Ct. at 785-86. Petitioner's third and fourth claims for relief are

11   without merit.

12        **C.    Claim Five: Impeachment Evidence**

13        Petitioner contends that the trial court violated his right to present a defense under

14   the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the

15   Fourteenth Amendment by precluding him from establishing that the lead detective had

16   a strong personal relationship with the victim and planted evidence to help convict

17   Petitioner. (Pet. at 23-27.) Specifically, Petitioner asserts he was denied the right to

18   present evidence that the detective might have planted evidence in another investigation

19   and that in light of his previous actions, the detective could have planted the victim's

20   earring in Petitioner' residence in the present case. (Id.)

21             1.    State Court Decision

22        Petitioner presented his claim in his collateral appeal in the form of a petition for

23   writ of habeas corpus to the Kern County Superior Court. (Lodged Doc. 7.) The claim

24   was denied in a reasoned decision by the Kern County Superior Court and summarily

25   denied in subsequent petitions by the California Court of Appeal, Fifth Appellate District

26   and the California Supreme Court. (See Lodged Docs. 8-10, 15-16.) Since the California

27   Supreme Court denied the petition in a summary manner, this Court "looks through" the

28   decisions and presumes the Supreme Court adopted the reasoning of the Kern County

1 | Superior Court, the last state court to have issued a reasoned opinion. See Ylst v.

2 | Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look

3 | through" presumption that higher court agrees with lower court's reasoning where former

4 | affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7

5 | (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in

6 | determining whether state court's rejection of petitioner's claims was contrary to or an

7 | unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

8 |     In denying Petitioner's claim, the Superior Court explained that:

9 |
10 |     The second claim is that Officer Lackey had a bias against petitioner because he frequented the gas station and knew Ms. Meas. Petitioner states this as a reason for Detective Lackey to plant an earring in petitioner's residence.

11 |

12 |     The appellate court found no merit in this argument by finding no error by the trial court to deny the motion to suppress evidence pursuant to P.C. Section 1538.5. Furthermore, the appellate court found no abuse

13 | of discretion by the trial court to open personnel records to enable the defense to argue hostility by Detective Lackey against defendant.

14 | Although Detective Lackey supervised the murder investigation, it was Detective Olmos who found the earring on the floor near petitioner's bed.

15 |

16 | (Lodged Doc. 8 at 4.)

17 |     2.   Analysis

18 |     "Whether rooted directly in the Due Process Clause of the Fourteenth

19 | Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth

20 | Amendment,[1] the Constitution guarantees criminal defendants 'a meaningful opportunity

21 | to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.

22 | Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106

23 | S. Ct. 2142, 90 L. Ed. 2d 636 (1986). Due process is violated only where the excluded

24 | evidence had "persuasive assurances of trustworthiness" and was "critical" to the

25 |
26 | [1] In regard to Petitioner's Confrontation Clause argument, the Supreme Court has expressly stated that it "has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." Nevada v. Jackson, 133 S. Ct. 1990, 1994, 186 L. Ed. 2d 62 (2013).

27 | (emphasis in original). Thus, there was no violation of clearly established federal law as set out by the Supreme Court. Therefore, the Court will limit its analysis to Petitioner's due process argument.

28 |

1   defense. <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297

2   (1973); accord <u>Green v. Georgia</u>, 442 U.S. 95, 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738

3   (1979). A trial court retains wide latitude to exclude evidence that is repetitive or only

4   marginally relevant. <u>See</u> <u>Crane</u>, 476 U.S. at 689-90; <u>Holmes</u>, 547 U.S. at 326-27. "Only

5   rarely has [the Supreme Court] held that the right to present a complete defense was

6   violated by the exclusion of defense evidence under a state rule of evidence." <u>Jackson</u>,

7   133 S. Ct. at 1992. Moreover, even if this Court found a violation of petitioner's

8   constitutional rights, the error would only provide grounds to grant a writ of habeas

9   corpus if it had a "substantial and injurious effect or influence in determining the jury's

10  verdict." <u>Brecht</u>, 507 U.S. at 637.

11          The trial court precluded the impeachment testimony under California Evidence

12  Code § 352. 18 Rept'r. Tr. at 4901-25. Evidence Code § 352 gives the trial court

13  discretion to exclude evidence if its probative value is substantially outweighed by the

14  probability that its admission will necessitate undue consumption of time or create

15  substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

16  Cal. Evid. Code § 352. Here, Petitioner's motivation for impeaching the detective was to

17  attempt to establish that the detective planted evidence of the murder, specifically the

18  victim's earring, at Petitioner's residence. Petition at 23-27. However, as the trial court

19  noted, the evidence from the prior case only showed that the detective found a bullet

20  casing, not that the detective falsely planted the bullet casing at the crime scene. 18

21  Rept'r. Tr. at 4925. The Superior Court, in denying the claim, further explained that

22  another detective, Detective Olmos, found the earring that Petitioner asserts that

23  Detective Lackey planted in petitioner's residence. (Lodged Doc. 8.) Based on the

24  evidence, there was not strong support that Detective Lackey planted the earring or had

25  a pattern of planting evidence in prior cases. The record shows that the purported

26  impeachment evidence was relatively weak and only marginally relevant to Petitioner's

27  defense. Thus, the trial court's decision to exclude this evidence from the trial did not

28  violate petitioner's due process rights. <u>See</u> <u>Crane</u>, 476 U.S. at 689-90; <u>Holmes</u>, 547 U.S.

1    at 326-27. In addition, Petitioner has failed to show that the exclusion of this evidence

2    had a substantial or injurious effect or influence in determining the jury's verdict. See

3    Brecht, 507 U.S. at 637. At minimum, other forensic evidence that was not allegedly

4    planted at Petitioner's residence linked him to the crime.

5         Accordingly, the state court's rejection of this claim was not contrary to, or an

6    unreasonable application of, clearly established Federal law, as determined by the

7    Supreme Court. Petitioner is not entitled to habeas relief on this claim.

8         **D.    Claim Six: Prosecution's Failure to Correct False Testimony**

9         Petitioner claims that false evidence was used to secure his conviction in violation

10   of his rights under the Fifth and Fourteenth Amendments. In support of this claim,

11   Petitioner alleges that Detective Lackey presented false evidence by not stating that he

12   had previously entered Petitioner's residence to plant the earring and leave a business

13   card. (Am. Pet at 29-31.) Petitioner asserts that the district attorney knew that the

14   detective was testifying falsely but failed to correct the testimony. (Id.)

15                    1.    State Court Decision

16        Petitioner presented this claim in a petition to the California Supreme Court. That

17   Court issued a summary denial. (Lodged Docs. 15-16.) Accordingly, "[u]nder § 2254(d),

18   a habeas court must determine what arguments or theories supported or, as here, could

19   have supported, the state court's decision; then it must ask whether it is possible

20   fairminded jurists could disagree that those arguments or theories are inconsistent with

21   the holding in a prior decision of this Court." Richter, 131 S. Ct. at 786.

22                    2.    Analysis

23        The knowing use of perjured testimony against a defendant to obtain a conviction

24   violates a criminal defendant's federal right to due process of law. Napue v. Illinois, 360

25   U.S. 264, 268-70, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); see also Hayes v. Brown,

26   399 F.3d 972, 978 (9th Cir. 2005) ("One of the bedrock principles of our democracy,

27   implicit in any concept of ordered liberty, is that the State may not use false evidence to

28   obtain a criminal conviction." (internal citations omitted)). Petitioner bears the burden of

1   "alleg[ing] facts showing that there was knowing use of the perjured testimony by the

2   prosecution." Pavao v. Cardwell, 583 F.2d 1075, 1076 1077 (9th Cir. 1978). In the

3   context of the presentation of false evidence, Petitioner must prove all of the following:

4   "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should

5   have known that the testimony was actually false, and (3) that the false testimony was

6   material." United States v. Zuno Arce, 339 F.3d 886, 889 (9th Cir. 2003) (citing Napue,

7   360 U.S. at 269 271.) Under Napue, false testimony is material, and therefore

8   prejudicial, if there is "any reasonable likelihood that the false testimony could have

9   affected the judgment of the jury." Hayes, 399 F.3d at 984 (internal citation omitted).

10      The fact that there may be inconsistencies in certain witnesses statements and

11   other conflicts in the evidence does not establish that the prosecution presented false

12   testimony. See United States v. Zuno Arce, 44 F.3d 1420, 1423 (9th Cir. 1995)

13   (inconsistencies between testimony at trial and retrial did not amount to presentation of

14   false testimony); see also United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997)

15   ("that a witness may have made an earlier inconsistent statement, or that other

16   witnesses have conflicting recollection of events, does not establish that the testimony

17   offered at trial was false"). Mere speculation regarding these factors is insufficient to

18   meet the petitioner's burden. United States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).

19      In this case, Petitioner has failed to demonstrate that Detective Lackey's

20   testimony was, in fact, false. Petitioner only presented circumstantial evidence that the

21   detective provided false testimony. In support of his claim, Petitioner argues that the

22   detective lied when he testified that he did not know how his business card got inside the

23   house. (Rept'r Tr. at 3525.) However, as the state court explained, the detective had left

24   business cards at Petitioner's address telling Petitioner to contact him. (Lodged Doc. 8 at

25   2.)

26      Determinations of factual issues by the state court are presumed to be correct. 28

27   U.S.C. § 2254(e)(1). While there was evidence that the business card was placed at the

28   house, it is reasonable that the detective might not know exactly how the card arrived at

1   its final location in the residence. Petitioner has not provided sufficient evidence that the

2   detective falsely testified that he did not know how the card got in Petitioner's house.

3   Likewise, Petitioner contends that the detective planted false evidence in a separate

4   case, but has not provided actual evidence of the false evidence. Regardless, as

5   Petitioner was not allowed to introduce that evidence at trial, the detective did not have

6   the opportunity to provide that allegedly false testimony to the jury.

7          Given the evidence, it would be unreasonable to suggest, much less find, that the

8   district attorney knew that the detective was providing false testimony, and nevertheless

9   allowed him to testify. Petitioner has failed to show that Detective Lackey's testimony

10  was actually false. Even if falsity had been established, he has failed to show that the

11  prosecution knew or should have known of that falsity. Accordingly, Petitioner has not

12  shown that the state court's denial of this claim was a contrary or an unreasonable

13  application of Federal law under 28 U.S.C. § 2254(d)(1). Petitioner is not entitled to

14  federal habeas relief on his claim based on the prosecution's failure to correct false

15  testimony.

16         **D.    Confrontation Clause**

17         Petitioner claims that it was a violation of his rights under the Confrontation

18  Clause to allow the admission of statistical information of random match DNA profile

19  evidence provided by the prosecution's experts. (Am. Pet. at 32-35.) Petitioner asserts

20  that the statistical evidence was erroneously admitted as non-testimonial. (Id.)

21                1.    State Court Decision

22         Petitioner presented this claim in a petition to the California Supreme Court. The

23  court issued a summary denial. (Lodged Docs. 15-16.) Accordingly, "[u]nder § 2254(d), a

24  habeas court must determine what arguments or theories supported or, as here, could

25  have supported, the state court's decision; then it must ask whether it is possible

26  fairminded jurists could disagree that those arguments or theories are inconsistent with

27  the holding in a prior decision of this Court." Richter, 131 S. Ct. at 786.

28                2.    Applicable Law

The Confrontation Clause of the Sixth Amendment affords a criminal defendant the right to face and cross-examine witnesses who testify against him. Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845, 110 S. Ct. 3157, 3163, 111 L. Ed. 2d 666 (1990). In Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54.

Crawford did not spell out a comprehensive list of "testimonial" statements but noted that they include (1) "ex parte in-court testimony or its functional equivalent," such as affidavits, custodial examinations, prior testimony made without cross-examination, and "similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) extrajudicial statements contained in formalized testimonial materials; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52, 68. Crawford noted, however, that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. at 59 n.9.

In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11, 129 S. Ct. 2527, 2532, 174 L. Ed. 2d 314 (2009), the Supreme Court held that sworn "certificates" from laboratory analysts indicating that a substance found in a defendant's possession was a particular drug were testimonial, in that they were "plainly affidavits" produced for their evidentiary purpose. Describing the analysts as actual "witnesses" and the certificates as "functionally identical" to their "live, in-court testimony," the Supreme Court concluded that without cross-examination, the defendant was precluded from ascertaining "what

1   tests the analysts performed, whether those tests were routine, and whether interpreting

2   their results required the exercise of judgment or the use of skills that the analysts may

3   not have possessed." Id. at 310-11, 320.

4   In Bullcoming v. New Mexico, 564 U.S.    , 131 S. Ct. 2705, 180 L. Ed. 2d 610

5   (2011), the Supreme Court held that laboratory reports of blood-alcohol tests showing a

6   defendant's blood-alcohol level were testimonial and the government could not bypass

7   Confrontation Clause protections by offering for cross-examination another laboratory

8   technician who was merely familiar with the procedure but did not actually conduct those

9   tests. 131 S. Ct. at 2714. The Court specified that the Confrontation Clause disallowed

10  surrogate testimony from those "who did not sign the certification or perform or observe

11  the test reported in the certification"; instead, the defendant has the right "to be

12  confronted with the analyst who made the certification." Id. at 2710.

13  A Confrontation Clause violation is subject to harmless error analysis. Ocampo v.

14  Vail, 649 F.3d 1098, 1114 (9th Cir. 2011). Thus, a habeas petitioner is generally not

15  entitled to relief unless the error had a "substantial and injurious effect or influence in

16  determining the jury's verdict." Brecht, 507 U.S. at 638.

17          3.      Analysis

18  The state courts' denial of Petitioner's Confrontation Clause claims was not

19  contrary to or an unreasonable application of Crawford, Melendez-Diaz, or Bullcoming.[2]

20  The challenged statistical databases upon which criminalist Dechelle Smothers relied

21  were not offered for the truth of the matter submitted and regardless was not the type of

22  evidence that the Confrontation Clause has been understood to reach. See Williams v.

23  Illinois, 567 U.S.    , 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012).

24  _____

25          [2] Crawford, Melendez-Diaz, and Bullcoming predated the relevant state-court decision in this case,
    the state supreme court's denial of Petitioner's Confrontation Clause claims in November 2013. (See
26  Lodged Doc. 16.) Those cases therefore constitute "clearly established" federal law for AEDPA purposes.
    The Supreme Court also issued Williams v. Illinois, 567 U.S.    , 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012)
27  (plurality opinion), further delineating the scope of the Confrontation Clause prior to the state decision. As
    discussed below, Williams confirms that the state courts' denial of Petitioner's Confrontation Clause claims
28  was not contrary to or an unreasonable application of then-existing clearly established federal law.

1  Petitioner does not challenge Smothers' testimony regarding the testing of the

2  DNA samples or her ability to match samples of DNA which she herself tested. Petitioner

3  only challenges the use of databases and algorithms by Smothers in opining as to the

4  frequency of the DNA samples in the greater population. Specifically, Smothers

5  described how she used ethnicity databases to assist in determining her opinion

6  regarding the probability of finding an identical match in the relevant population. (Rep.

7  Tr. at 3983-85.).

8  The Supreme Court's decision in Williams v. Illinois, 132 S. Ct. 2221, (2012)

9  forecloses Petitioner's arguments. In Williams, a four-justice plurality held that the

10  testimony of a DNA expert who matched a DNA profile extracted from the victim's

11  vaginal swabs by an outside laboratory to the defendant did not violate the Confrontation

12  Clause, even though no one from that laboratory testified at trial. Id. at 2227-28. The

13  plurality provided two reasons for its decision: (1) the out-of-court statements referenced

14  by the expert about the laboratory result were offered solely to explain the assumptions

15  underpinning her opinion and not for their truth, and (2) even if offered for the truth, the

16  laboratory result about a DNA profile was not testimonial because it was not "inherently

17  inculpatory" or "prepared for the primary purpose of accusing a targeted individual." Id.

18  at 2228, 2235-36, 2242-44. As to the first part, the plurality observed that "it is settled

19  that the Confrontation Clause does not bar the admission of . . . statements" "not

20  admitted for the truth of the matter asserted." Id. at 2227-28 (citing Crawford, 541 U.S. at

21  59 n.9). Justice Thomas's concurrence and Justice Kagan's dissent also acknowledged

22  Crawford's premise that testimonial statements not admitted for their truth do not violate

23  the Confrontation Clause, but both concluded that the expert's statements about the

24  suspect's DNA profile from the laboratory had been offered for their truth. See id. at 2258

25  (Thomas, J., concurring in judgment), 2268-69 (Kagan, J., dissenting); see also Dorsey

26  v. Stephens, 720 F.3d 309, 317 & n.30 (5th Cir. 2013) (noting that Confrontation Clause

27  "applies only to statements offered to prove the truth of the matter asserted" (citing

28  Williams, 132 S. Ct. at 2228)).

1    Even assuming that the databases here were both offered for their truth and

2  testimonial in nature, <u>Williams</u> does not address how Smother's testimony, based on

3  those databases, should be treated under the Confrontation Clause. <u>See</u> <u>United States</u>

4  <u>v. Pablo</u>, 696 F.3d 1280, 1293 (10th Cir. 2012) (commenting, after <u>Williams</u>, that "the

5  manner in which, and degree to which, an expert may merely rely upon, and reference

6  during her in-court expert testimony, the out-of-court testimonial conclusions in a lab

7  report made by another person not called as a witness is a nuanced legal issue without

8  clearly established bright line parameters").

9    Finally, even if the admission of the DNA report here did violate Petitioner's right

10  of confrontation as a matter of clearly established Supreme Court law, it would not follow

11  that Petitioner is entitled to habeas relief. A Petitioner's claim that his confrontation rights

12  were violated is subject to harmless-error analysis. <u>See, e.g.</u>, <u>Bullcoming</u>, 131 S. Ct. at

13  2719 n.11; <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 681-84, 106 S. Ct. 1431, 89 L. Ed. 2d

14  674 (1986); <u>Winzer v. Hall</u>, 494 F.3d 1192, 1201 (9th Cir. 2007) ("Violation of the

15  Confrontation Clause is trial error subject to harmless-error analysis . . . because its

16  effect can be 'quantitatively assessed in the context of other evidence presented' to the

17  jury."). Thus, Petitioner would only be entitled to habeas relief if the Confrontation Clause

18  error had a "substantial and injurious effect or influence in determining the jury's verdict."

19  <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353

20  (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 121, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (on

21  federal habeas review, courts must assess the prejudicial impact of constitutional error in

22  a state-court criminal trial under <u>Brecht</u> standard).

23    Whether a Confrontation Clause violation is harmless depends on a variety of

24  factors, including (1) the importance of the witness's testimony in the prosecution's case,

25  (2) whether the testimony was cumulative, (3) the presence or absence of evidence

26  corroborating or contradicting the testimony of the witness on material points, (4) the

27  extent of cross-examination otherwise permitted, and (5) the overall strength of the

28

1    prosecution's case. See Van Arsdall, 475 U.S. at 684.[3]

2         The first Van Arsdall factor arguably militates against a finding of harmless error

3    because the DNA evidence was some of the strongest evidence tying Petitioner to the

4    crime.

5         However, the second and third Van Arsdall factors both militate in favor of a

6    finding of harmless error because the DNA analysts' opinion was cumulative of and

7    corroborated by other evidence, specifically physical evidence with regard to the victim's

8    earring found at Petitioner's residence, and the large amount of evidence to show that

9    Petitioner had a romantic fixation with the victim. A search of Petitioner's house revealed

10   a box for a nine-millimeter Glock, a gun consistent with the hammer marks on the spent

11   round at the crime scene, and an earring matching the one the victim was still wearing

12   when she was found. Analysis of Petitioner's computer revealed he had performed

13   searches under the victim's name, and inquiries regarding how to date Cambodian

14   women. Furthermore, witness Glenn Osbourne testified that the day after the incident

15   Petitioner confessed to the killing to victim and getting rid of the firearm. Osborne's

16   testimony revealed details of the homicide which had not been made public at the time

17   of his interview.  Based on the other evidence in the case, there significant amounts of

18   evidence that corroborated that Petitioner indeed committed the crime in question.

19        Further, the fourth Van Arsdall factor also militates in favor of a finding of

20   harmless error. The defense subjected criminalist Smothers to cross-examination. (See

21   15 Rep. Tr. 4120-25.) See also Larkin v. Yates, 417 Fed. Appx. 708, 709-10 (9th Cir.

22   2010) (admission of DNA results was harmless under Confrontation Clause where, inter

23   alia, testifying expert was subject to cross-examination and recross-examination).

24        The fifth Van Arsdall factor also militates in favor of a finding of harmless error

25   because of the overall strength of the prosecution's evidence against Petitioner. In light

26   _____

27        [3] Although Van Arsdall involved a direct appeal rather than a habeas action, "there is nothing in
     the opinion or logic of Van Arsdall that limits the use of these factors to direct review." See Whelchel v.
     Washington, 232 F.3d 1197, 1206 (9th Cir. 2000); see also Merolillo v. Yates, 663 F.3d 444, 455 n.6 (9th

28   Cir. 2011).

of the physical evidence, circumstantial evidence, including evidence from the computer searches and witnesses who observed Petitioner's conduct towards the victim before the crime, and Petitioner's confession to Osborne, there was strong evidence of Petitioner's guilt even without the presentation of DNA evidence.

In sum, the fifth <u>Van Arsdall</u> factor militates strongly in favor of a finding of harmless error. The Court therefore finds, after balancing all five <u>Van Arsdall</u> factors, that any Confrontation Clause error in the admission of the DNA report did not have a substantial and injurious effect or influence in determining the jury's verdict.

Based on the foregoing, the Court finds that the California court's rejection of Petitioner's Confrontation Clause claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. Habeas relief is not warranted on this claim.

**V.    RECOMMENDATION**

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.

///

///

///

///

///

///

1    The parties are advised that failure to file objections within the specified time may

2  result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, __ F.3d __, __, No. 11-

3  17911, 2014 WL 6435497, at *3 (9th Cir. Nov. 18, 2014) (citing <u>Baxter v. Sullivan</u>, 923

4  F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   <u>December 29, 2014</u>        /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE

54